23

| AUSA: Philip Ross | Telephone: (313) 226-9790 |
|---|---|
| Special Agent    : Peter Hayes, FBI | Telephone: (313) 965-5506 |

AO 91 (Rev. 08/09) Criminal Complaint

# ORIGINAL

# UNITED STATES DISTRICT COURT
## for the
## Eastern District of Michigan

United States of America,

        Plaintiff,

v.

Dr. Martin Facundo Quiroga-Bayas,

        Defendant(s).

**Case: 2:14-mj-30333**
**Judge: Unassigned**
**Filed: 07-07-2014**
**USA V SEALED MATTER (CMC)**

---

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>January 2011 - Present</u>, in the county of <u>Oakland and Macomb</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 (a)(2) | False statements to the government |
| 18 U.S.C. §§ 841 and 846 | Conspiracy to distribute, and distribution of controlled substances outside the course of legitimate medical necessity |
| 18 U.S.C. §§ 1347 and 1349 | Conspiracy to commit health care fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑    Continued on the attached sheet.

                                            *Complainant's signature*

                              Peter Hayes, Special Agent, FBI
                                      *Printed name and title*

Sworn to before me and signed in my presence.

Date:  <u>July 7, 2014</u>

                                          *Judge's signature*

City and state:  <u>Detroit, Michigan</u>

                              Hon. R. Steven Whalen, U.S. Duty Magistrate Judge
                                      *Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A COMPLAINT AND ARREST WARRANT

I, Peter A. Hayes, Special Agent for the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION

I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such.  As a Special Agent, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, prescription drug diversion, and money laundering.  I have been personally involved in investigations concerning health care fraud, prescription drug diversion and methods used to finance and conceal the profits of such operations.  I have investigated numerous doctors, pharmacies and prescription drug dealers, and have interviewed numerous self proclaimed drug users, prescription drug dealers, pharmacists, medical doctors, and owners and employees of medical clinics.  I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud.  I am familiar with the Medicare program, as well as the federal healthcare fraud and narcotics trafficking laws.  I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud and prescription drug diversion.  I am assigned to an investigation pertaining to health care fraud, and the diversion of controlled substances by Doctor MARTIN FACUNDO QUIROGA-BAYAS, and others not named.  The information herein is known to me through personal knowledge and investigation and/or from review of documents and interviews of people having direct knowledge of these events.  This affidavit does not include every fact that is known to me.

1

This Affidavit is respectfully submitted in support of a complaint and arrest warrant for Doctor MARTIN FACUNDO QUIROGA-BAYAS (QUIROGA), date of birth, June XX, 1974, who resides at XXXXX, Rochester Hills, Michigan.  This request is based on probable cause that QUIROGA, and others not named, conspired to dispense and divert, and did dispense and divert, in excess of 43,000 tablets of Oxycodone Hydrochloride, and in excess of 270,000 tablets of Hydrocodone Bitartrate and Acetaminophen (commonly known by the brand names Vicodin, Lortab and Norco), Schedule II and Schedule III prescription narcotics, respectively, in violation of Title 21 United States Code (USC) Sections 846 and 841(a)(1), and conspired to commit, and did commit, Health Care Fraud, in violation of Title 18 USC Sections 1349 and 1347, by knowingly allowing these prescriptions to be paid for under the Medicare program, and for billing, or facilitating the billing of, the Medicare program for services not provided. Additionally, this request is also based on probable cause that QUIROGA provided false statements to the Drug Enforcement Administration (DEA), in violation of Title 18 United States Code (USC) Section 1001(a)(2).

The source of your affiant's information and the grounds for your affiant's belief are as follows:

## SUMMARY OF INVESTIGATION

1.      Your affiant, personally, and in conjunction with other law enforcement agencies, has been involved in the investigation of allegations that QUIROGA, and others, were previously utilizing the business CAREFIRST OCCUPATIONAL & REHAB to bill the Medicare system for services not provided, and in the diversion of Adderall, Hydrocodone, Alprazolam, and other controlled substances, and are currently utilizing QUIROGA's private medical

2

practice, known as MICHIGAN ADVANCED PAIN & SPINE, in the diversion
of Oxycodone, Hydrocodone, Alprazolam, and other controlled substances, in a
scheme to defraud the Medicare program and other insurance companies.

## THE MEDICARE PROGRAM

2. The Medicare Program (Medicare) is the federal healthcare program for the aged
   and disabled established by Congress in 1965, as Title XVIII of the Social
   Security Act and codified at 42 U.S.C. § 1395. Medicare is a "health care benefit
   program" as defined by Title 18, United States Code, Section 24(b).  Medicare is
   administered through the Centers for Medicare and Medicaid Services (CMS).
   CMS is a division of the United States Department of Health and Human
   Services. Individuals who receive benefits under Medicare are referred to as
   Medicare "beneficiaries."

3. Medicare includes coverage under two primary components, hospital insurance
   (Part A) and medical insurance (Part B). Part A covers physical therapy,
   occupational therapy, and skilled nursing services if a facility was certified by
   CMS as meeting certain requirements. Part B of the Medicare Program covers the
   cost of physicians, services and other ancillary services not covered by Part A.

4. Medicare Part D provides prescription drug coverage to persons who are eligible
   for Medicare. Under the program, eligible Medicare beneficiaries may enroll in a
   Medicare Prescription Drug Plan that adds prescription drug coverage to
   traditional Medicare. Alternatively, Medicare eligible beneficiaries may obtain
   prescription drug coverage by enrolling in a Medicare Advantage Plan under Part
   C of the Medicare program. Such Medicare Advantage Plans provide the full

range of Medicare coverage to enrollees, including a prescription drug benefit under Medicare Part D.

5. Cahaba Safeguard Administrators, LLC (Cahaba) was the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan as of July 2014.  Prior to April 24, 2012, the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan was Trust Solutions, LLC (Trust Solutions).

6. Health Integrity, LLC. (Health Integrity) was the National Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC) for Medicare Part D in the state of Michigan as of July 2014.

7. The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." What is "reasonable and necessary" for certain conditions is defined based upon accepted practices in the medical community, as further defined by National Coverage Determinations issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

8. In order to bill the Medicare Part A or Part B Programs (or private insurance programs), a medical provider must bill for one, or more, Current Procedural Terminology (CPT) Code(s).   CPT Codes, which are developed and maintained by the American Medical Association (AMA), are individualized numbers which are assigned to every task or service a medical provider might perform on a patient.  CPT codes are then used by Medicare, and private insurance companies, to determine the amount of reimbursement, or payment, a medical provider will receive for the task or service performed on a patient.   As CPT codes are meant to ensure uniformity by the AMA, all medical providers and insurance companies use the same set of CPT Codes which are updated annually.

## **PRESCRIPTION DRUG DIVERSION**

9.  Controlled substance diversion, or prescription drug diversion, can best be
    defined as the diversion of otherwise licit drugs for illicit purposes. Based on
    experience and specialized training as a Special Agent, and experience in
    investigating similar drug diversion investigations, your Affiant is aware of
    prescribing patterns which are commonly seen by physicians prescribing
    controlled substances outside the course of legitimate medical practice and
    pharmacies dispensing these substances outside legitimate pharmacy practice.
    These patterns include, but are not limited to, multiple patients receiving the same
    combination of controlled substances; the use of multiple pharmacies by patients
    to fill prescriptions; individuals traveling outside of the area in which they live to
    obtain prescriptions; excessive numbers of identical prescriptions in different
    names prescribed by the same doctor and filled by the same pharmacy; patients
    obtaining excessive quantities of controlled substances over an extended period of
    time; patients obtaining similar prescriptions from multiple different doctors;
    patients receiving multiple prescriptions simultaneously for different opiate-based
    narcotics, or other substances with a known street desire; patients receiving
    prescriptions for the maximum dosage of a narcotic, or other controlled
    substance, with no titration ("ramp up") or trial period; patients of limited means
    paying for expensive narcotics with cash; doctors routinely prescribing the
    highest available dosage of a controlled substance; patients involved in drug
    distribution conspiracies obtaining medications from a specific doctor; and
    doctors changing their prescribing habits in line with the current street desire, or
    highest street value, of certain controlled substances.

10. Title 21 United States Code (U.S.C.) section 822(a)(1) requires that every person

who manufactures or distributes a controlled substance must be registered by the Attorney General of the United States. Such registrations are maintained by the U.S. Drug Enforcement Administration (DEA), and the registrant's activity with controlled substances is limited to the extent of his/her registration. Title 21 U.S.C. 802(21) defines a "practitioner" as a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital or other person, licensed, registered or otherwise permitted by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

11. Title 21 of the U.S.C. 822(a)(2) requires that every person who proposes to dispense any controlled substance, shall obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him. Title 21 U.S.C. 802(10) defines the term "dispense" as to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of controlled substance for such delivery. Title 21 U.S.C. 802(27) defines "ultimate user" as a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household.

12. Title 21 of the Code of Federal Regulation (C.F.R.), Sec. 1306.04(a) states that in order for a prescription for a controlled substance to be effective it must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a

prescription within the meaning and intent or section 309 of the Controlled Substances Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

13. The Controlled Substances Act (CSA) was enacted into U.S. law by Congress in 1970, as part of Title 21 of the United States Code.   Drugs which are considered controlled substances under the CSA are grouped into one of five "Schedules" (Schedule I – Schedule V).  Substances assigned to Schedule I have no currently accepted medical usage in the United States, and therefore may not be prescribed by a doctor or filled by a pharmacist.

14. The U.S. Drug Enforcement Administration  (DEA) has determined certain prescription medications are "controlled" based on their potential for addiction and abuse.  The DEA assigns a "Schedule" to these prescription medications according to their potential for abuse and addiction, with a controlled substance in Schedule II having the highest potential for addiction and abuse, among all substances available for prescription.  Prescription drugs which are "controlled" are assigned to Schedule II, III, IV, or V.

15. Oxycodone Hydrochloride (commonly known by the brand names of OxyContin® and ROXICODONE®) is an opioid analgestic, and a Schedule II Controlled Substance as defined in Title 21 of the United States Code. Oxycodone Hydrocloride (HCl) is generally referred to simply as "Oxycodone" or "Oxy."  Oxycodone is also the narcotic ingredient in Percocet, Percodan, Endocet, Tylox, and other similar narcotics designed and marketed for pain relief. The effects of Oxycodone, when abused or misused, are similar to that of heroin, and can result in overdose and/or death.

    A. OxyContin® is a time-released version of oxycodone, and is intended for

7

the management of moderate to severe pain when a continuous, around-the-clock opioid analgestic is needed for an extended period of time. According to the manufacturer of OxyContin®, Purdue Pharma, L.P. (Purdue), oxycodone has an abuse liability similar to morphine. OxyContin® is available in seven different dosage units, ranging from the smallest of 10mg, to the largest of 80mg. According to Purdue, the 60mg and 80mg tablets of OxyContin® are intended only for opioid-tolerant patients and prescribers of OxyContin® should individually titrate patients to the proper dosage, with especially close monitoring of the patient within the first 24-72 of OxyContin® treatment. OxyContin® is intended to be taken every 12 hours, and only one tablet per dosage. Therefore, based off the largest available dosage being an 80mg tablet, the maximum daily dosage, according to the manufacturer would be 160mg per day, or approximately 60 (sixty) 80mg tablets per month.

B. ROXICODONE® (or generic Oxycodone HCl equivalents) is an immediate-release opioid analgestic, available in 5mg, 15mg, or 30mg dosage units. According to the manufacturer of ROXICODONE®, Mallinckrodt, LLC (a division of parent company Covidien), patients should be started on ROXICODONE® in a dosing range of 5 to 15mg every 4-6 hours as needed for pain, and dosing should be titrated for individual patients. Further, for continued control of severe chronic pain, ROXICODONE® should be administered every 4-6 hours at the lowest dosage level that will achieve adequate pain relief. Also according to the manufacturer, respiratory depression is the chief hazard of ROXICODONE® and abuse of ROXICODONE® poses a risk of overdose and death.

16. Amphetamine Salt Combinations or Mixed Amphetamine Salts (commonly

known by the brand name Adderall) is a mixture of amphetamine and dextroamphetamine which are central nervous system stimulants that are intended to be used for narcolepsy, and attention deficit hyperactivity disorder (ADHD), and a Schedule II Controlled Substance as defined in Title 21 of the United States Code. Adderall is available in both immediate release and extended release forms. Adderall is often diverted due to it being used as a "party drug." When used outside of legitimate medical purposes, Adderall gives the user a "high" similar to being on "speed" which increases the heart rate. The most common side effect of Adderall is insomnia, which accounts for part of the reason it is known as a "party drug" as it can keep users awake and alert for long periods of time.

17. Hydrocodone Bitartrate is an opioid-analgestic and/or antitussive which is currently only available in combination with other ingredients, and different combination products are prescribed for different uses. Hydrocodone Bitartrate is commonly known for being combined with Acetaminophen (commonly known by the brand name Tylenol) to form a narcotic pain reliever tablet (commonly known by the brand names, Vicodin®, Lortab®, Lorcet®, and Norco®). This Hydrocodone Bitartrate/Acetaminophen combination is a Schedule III Controlled Substance as defined in Title 21 of the United States Code, and is used to relieve moderate to severe pain. Hydrocodone Bitartrate/Acetaminophen is available in approximately ten different dosage units with varying dosages of both the Hydrocodone Bitartrate portion and/or the Acetaminophen portion. The available dosage portion of Hydrocodone Bitartrate, in any combination of dosage units, are 2.5mg, 5mg, 7.5mg, and 10mg.

18. Alprazolam (commonly known by the brand name XANAX) is a benzodiazepine and a Schedule IV Controlled Substance as defined in Title 21 of the United States Code. Alprazolam works by slowing down the movement of chemicals in

9

the brain that may become unbalanced. This results in a reduction in nervous tension (or anxiety). Alprazolam is primarily intended to treat anxiety and/or panic disorders. Alprazolam is often used recreationally, or through addiction, due to its ability to cause the user feelings of relaxation, calm, or overall wellbeing. Alprazolam is available in four different dosage units, ranging from the smallest of 0.25mg, to the largest of 2mg. The most commonly diverted dosage units are the 1mg and 2mg versions which are often referred to as "footballs" and "bars," respectively, due to their physical shapes. According to the manufacturer of XANAX, Pfizer Inc. (Pfizer), psychological dependence is a risk with all benzodiazepines, including XANAX, and withdrawal symptoms can range from mild dysphoria and insomnia to a major syndrome that may include abdominal and muscle cramps, vomiting, sweating, tremors and convulsions. Pfizer recommends that all patients on XANAX who require a dosage reduction be gradually tapered under close supervision and addiction-prone individuals should be under careful surveillance when receiving XANAX. Furthermore, Pfizer recommends a dosage range of 0.75mg to 4.0mg per day to treat transient anxiety and anxiety disorder. Pfizer points out that the treatment of panic disorders often requires an average daily dosage in excess of 4mg; however dependence may be higher for panic disorder patients treated with average daily dosages in excess of 4mg.

19. Through your Affiant's investigation of this and other drug diversion conspiracies, your Affiant is aware of numerous individuals and organizations of individuals in the greater Detroit, Michigan area diverting OxyContin®, OPANA®, Oxycodone HCl, Adderall, Hydrocodone Bitartrate/Acetaminophen, Alprazolam, Promethazine/codeine syrup, and other controlled substances for illegal sale within the state of Michigan and/or out of the state of Michigan. These organizations often include, but are not limited to: doctors or medical

office workers who write the prescriptions; pharmacists and pharmacy owners and/or workers who fill these prescriptions without appropriate scrutiny; patient recruiters, who bring patients to doctors; runners, who bring the prescriptions to pharmacies; drug dealers or transporters who sell the pills and/or transport them to the street market; patients who allow these medications to be written and filled in their names; and in some cases an individual who controls the organization. An individual can act in any one or more of the above mentioned capacities within these drug diversion conspiracies and organizations.

20. Through your Affiant's investigation of this and other drug diversion conspiracies, your Affiant is aware of various street prices of the most commonly diverted controlled substances.  While prescription substances have varying street prices depending upon geographical location, your Affiant is aware of numerous organizations of individuals in the greater Detroit, Michigan area diverting controlled substances out of the state of Michigan to locations where the street prices for these controlled substances are often higher.  Your Affiant has learned of the following prices which can be obtained by illegal street sales of the above mentioned narcotics:

    A. Oxycodone – Prices of $1.00 per milligram, or more, can often be obtained, or have been obtained for oxycodone tablets such as OxyContin® or ROXICODONE®

    B. OPANA® - Prices of $1.50 per milligram, or more, can often be obtained, or have been obtained for OPANA® tablets.

    C. Adderall - Prices of $5.00 per tablet, or more, can often be obtained, or have been obtained for Adderall tablets.

    D. Hydrocodone Bitartrate/Acetaminophen – Prices of $5.00-$6.00 per tablet can often be obtained, or have been obtained for Hydrocodone Bitartrate/ Acetaminophen tablets.   Street prices of these tablets vary widely based

off the amount of Hydrocodone contained in the tablet. While a 7.5/750mg tablet of Vicodin® will often sell for $5.00 or more, a Lortab® or NORCO® tablet containing 10mg of Hydrocodone will often sell for $6.00 or more.

E. Alprazolam - Prices of $2.00 per milligram, or more, can often be obtained, or have been obtained for Alprazolam tablets.

F. Promethazine/codeine syrup - Prices of up to $50.00 per liquid ounce (or approximately 30 milliliters), can often be obtained, or have been obtained for Promethazine/codeine syrup.

## CASE BACKGROUND

21. This case was predicated on a referral from the Medicare Part B - Program Safeguard Contractor, Trust Solutions, showing a 99.5% denial rate of 40 reviewed medical claims submitted from Joel Milliner, M.D. (Milliner), while Milliner was employed as a medical doctor at a company by the name of ELITE WELLNESS, LLC (ELITE). ELITE, which was owned and operated by Raymond Arias, submitted approximately $12,500,000 in fraudulent Medicare claims for treatments prescribed by Milliner and other physicians.

22. In or around May 2010, ELITE ceased operations, and Arias, along with his wife, Emilitza Arias, opened and operated CAREFIRST OCCUPATION & REHAB (CAREFIRST). The majority of CAREFIRST's business was seeing purported auto accident patients, although a few select Medicare beneficiaries, which were brought from ELITE to CAREFIRST, were given infusions which were purportedly for their condition of being HIV positive. The CAREFIRST business was opened under the name of Emilitza Arias. At the time CAREFIRST was

12

opened, Emilitza Arias was approximately 23 years old, with a high school education and no specialized training in any medical or business field.

23. QUIROGA came to be employed as the primary physician at CAREFIRST, overseeing the majority of patients, until CAREFIRST ceased operations following the May 2012 arrests of Raymond and Emilitza Arias.

24. DURING his employment at CAREFIRST, QUIROGA billed, or caused to be billed, the Medicare system related to services not performed and/or prescription medications which were filled and paid for under Medicare coverage.

25. Raymond Arias, the actual owner/operator of ELITE and CAREFIRST, was sentenced to 100 months' imprisonment for his role at ELITE and CAREFIRST (12-cr-20259, Borman, J.). Raymond Arias previously served a federal prison sentence for cocaine trafficking, and lacks any higher education or medical training.

26. A cooperating witness (CW1), who has provided information which has been corroborated on numerous occasions, said the majority of auto accident patients at CAREFIRST did not actually need the procedures or physical therapy ordered by QUIROGA. Additionally, CW1 stated that Raymond Arias did not allow doctors employed by Raymond Arias or Emilitza Arias to prescribe Schedule II controlled substances.

27. Through training and experience, your affiant is aware that numerous doctors, and owners of medical clinics, who are engaged in prescription drug diversion, are reluctant to prescribe Schedule II controlled substances, due to the increased sentencing guidelines for Schedule II controlled substances, over Schedule III – Schedule V controlled substances, as well as the belief that prescribing large amounts of Schedule II controlled substances often brings increased scrutiny from law enforcement.

28. In or around July 2013, QUIROGA began his business MICHIGAN

13

ADVANCED PAIN & SPINE, which is located in Warren, Michigan.

29. Through training and investigation, your affiant is aware that certain doctors, purport to specialize in "pain management" in an effort to obtain patients. This is due to the fact that drug-seeking patients can claim to be in pain in an effort to obtain prescription pain medications which can then be sold through illegal "street sales" for a profit. By claiming to specialize in "pain management," doctors often obtain a large patient base in a short timeframe, which thereby allows the doctor to bill the patients' insurance coverage (Medicare, private health insurance and/or automobile insurance) for services which are often times questionable or, worse, medically unnecessary. Certain indicators that doctors may be involved in such activities, or prescription drug diversion, are described above.

## MICHIGAN AUTOMATED PRESCRIPTION SYSTEM (MAPS)

30. On January 1, 2003, the state of Michigan instituted the Michigan Automated Prescription System (MAPS). MAPS requires all pharmacies in the state of Michigan to report on a monthly basis all controlled substance prescriptions filled at their pharmacy. These reports must be submitted to MAPS by the 15th day of the following month in which the prescription was filled. Controlled substance information reported to MAPS includes, but is not limited to, the following:

Patient Data: Name, address, date of birth
Physician Data: Prescriber's name and DEA number
Drug: Name of controlled substance, strength, quantity, prescription number
Pharmacy Data: Dispensing Pharmacy, location, state license number

31. Your affiant has analyzed the MAPS data available on QUIROGA for the period January 1, 2011 through June 15, 2014, and noted numerous statistics indicative of prescription drug diversion, including, but not limited to, a sharp increase in

QUIROGA's prescribing habits upon opening his clinic MICHIGAN ADVANCED PAIN & SPINE.

32. Your affiant believes these data, based off QUIROGA's MAPS report analysis, when considered along with the fact that QUIROGA is self-employed in the area of "pain management," are indicative of a doctor engaged in the diversion of controlled substances, as described more particularly above.

## PROBABLE CAUSE FOR DIVERSION OF
## CONTROLLED SUBSTANCES AND HEALTH CARE FRAUD

33. CW1 and another cooperating witness (CW2), who has also provided information which has been corroborated on numerous occasions, stated that QUIROGA was often known to abuse cocaine. CW1 witnessed QUIROGA and Raymond Arias use cocaine together on numerous occasions.

34. MAPS data shows that QUIROGA prescribed Raymond Arias with prescriptions for Adderall on four occasions. As QUIROGA knows Raymond Arias to be an abuser of cocaine, your affiant asserts that it is outside legitimate medical practice for QUIROGA to prescribe Raymond Arias with Adderall.

35. CW1 stated that the prescriptions for Adderall which QUIROGA wrote for Raymond Arias were never intended to be used by Raymond Arias for any legitimate medical need. In fact, these prescriptions were filled by Raymond Arias and used during parties QUIROGA and Raymond Arias held with numerous prostitutes. CW1 stated that QUIROGA is known to hire numerous prostitutes at a time and use cocaine and/or Adderall with the prostitutes.

36. On June 25, 2014 your affiant conducted a custodial interview of a Medicare Beneficiary (BENEFICIARY-1), who is a known patient recruiter and dealer/trafficker of heroin, cocaine, and prescription drugs. BENEFICIARY-1,

after waiving his Miranda rights, stated that he had been seeing QUIROGA on a basis of approximately once per month for nearly a year. BENEFICIARY-1 described QUIROGA as a "good doctor." BENEFICIARY-1 elaborated that QUIROGA was a "good doctor" because he prescribed BENEFICIARY-1 with prescriptions for 30mg oxycodone and 2mg Xanax every month, which was what BENEFICIARY-1 wanted. BENEFICIARY-1 wanted these prescriptions because he regularly sold these medications through illegal street sales. BENEFICIARY-1 stated that he had just recently seen QUIROGA for a regular monthly appointment, during which BENEFICIARY-1 received the last of a planned series of injections to his back. QUIROGA has suggested that BENEFICIARY-1 allow QUIROGA to perform a surgery on BENEFICIARY-1's back, but BENEFICIARY-1 has declined. Additionally, during this visit, QUIROGA told BENEFICIARY-1 that he would no longer prescribe BENEFICIARY-1 with prescriptions for oxycodone because he had learned that BENEFICIARY-1 had been obtaining prescriptions for oxycodone from another doctor.

37. Your affiant asserts that it is reasonable to believe that QUIROGA would have learned of this by running a MAPS report on prescriptions filled by BENEFICIARY-1. Physicians who write prescriptions for controlled substances have the ability to, and should routinely, run MAPS reports on their patients to determine if the patients seeking controlled substances are obtaining controlled substances from other physicians. Your affiant has run a MAPS report for controlled substances filled by BENEFICIARY-1 and noted that BENEFICIARY-1 has received and filled prescriptions for controlled substances by numerous doctors, which is often referred to as "doctor shopping." In particular, BENEFICIARY-1 has been filling prescriptions for oxycodone from multiple doctors on a nearly monthly basis for a period of approximately six

16

months. QUIROGA did not discharge BENEFICIARY-1, but instead wrote BENEFICIARY-1 a prescription for Norco (a Schedule III controlled substance) as well as the usual prescription for Xanax. Had QUIROGA learned of BENEFICIARY-1's controlled substance history, QUIROGA would also have been aware that BENEFICIARY-1 had also recently filled a prescription for Norco which was written by a different doctor.

38. BENEFICIARY-1 regularly uses his Medicare coverage to fill the prescriptions received from QUIROGA and other doctors. However, during your affiant's review of BENEFICIARY-1's MAPS report, your affiant noted that BENEFICIARY-1 often paid cash to fill the oxycodone prescriptions BENEFICIARY-1 received from QUIROGA. Your affiant is aware that many Medicare beneficiaries who engage in doctor shopping know not to attempt to fill more than one of the same prescription (particularly Schedule II controlled substances) using their Medicare coverage in an attempt to avoid detection by Medicare, which in turn could be reported to law enforcement. Medicare beneficiaries often afford to pay for these medications in cash by subsequently selling the medications for a profit through illegal street sales. Had QUIROGA reviewed BENEFICIARY-1's MAPS report, QUIROGA, would have received information indicating that BENEFICIARY-1 was engaged in doctor shopping and paying for prescription medications with cash, as opposed to using available Medicare coverage.

39. Your affiant asserts that QUIROGA was aware of BENEFICIARY-1's practice of doctor shopping, but continued to prescribe BENEFICIARY-1 the desired oxycodone, as QUIROGA was billing BENEFICIARY-1's Medicare coverage for the injections BENEFICIARY-1 was receiving. As the scheduled injections had come to an end, and BENEFICIARY-1 had not shown an interest in undergoing surgery, QUIROGA would be faced with a decreased ability to

submit Medicare claims for services provided to BENEFICIARY-1.

40. QUIROGA has previously demonstrated his knowledge and willingness to discharge patients based on the patient's practice of doctor shopping. During an August 19, 2011 incident, while QUIROGA was working at CAREFIRST, which was located in Madison Heights, Michigan, the Madison Heights Police Department (MHPD) was contacted regarding an irate patient who had allegedly threatened to kill QUIROGA for discharging her. After the MHPD responded to CAREFIRST, QUIROGA provided the responding officers with a handwritten statement. Your affiant has obtained a copy of the police report, and the accompanying handwritten statement provided by QUIROGA, from the MHPD. Within his statement, QUIROGA wrote "I told her that I was discharging her due to non compliance with therapy and my professional belief that she is abusing narcotics." Additionally he wrote "I have a responsibility to follow legal standards provided by the DEA + my controlled substance license and I am forced to discharge her at this time. I also advised that giving her more pain meds. is not an option."

41. On July 3, 2014, your affiant interviewed a different Medicare beneficiary (BENEFICIARY-2). BENEFICIARY-2, who has been diagnosed with HIV, was a patient receiving infusion treatments at CAREFIRST, which were prescribed by Physicians other than QUIROGA. BENEFICIARY-2 stated that s/he also received monthly prescriptions of Vicodin and Xanax from QUIROGA. BENEFICIRY-2 received a full physical from QUIROGA on the first visit, but on subsequent visits QUIROGA simply talked briefly with BENEFICIARY-2 and wrote BENEFICIARY-2 with the regular prescriptions.

42. During BENEFICIARY-2's infusion treatment, QUIROGA was not in the room, but was in the building, and BENEFICIARY-2 occasionally saw QUIROGA in passing. The infusions were performed by Emilitza Arias, but never by

QUIROGA.  No one ever told BENEFICIARY-2 that s/he was not receiving the actual HIV infusions for which his/her Medicare coverage was being billed. BENEFICIARY-2 learned of this later while reading about the arrests of Raymond and Emilitza Arias and the search warrant conducted at CAREFIRST.

43. BENEFICIARY-2 also received physical therapy at CAREFIRST.  The referral for physical therapy was signed by QUIROGA, as QUIROGA was the main doctor at CAREFIRST.  The physical therapy, infusions and medications BENEFICIARY-2 received from CAREFIRST were all paid for by BENEFICIARY-2's Medicare coverage.

44. The first time BENEFICIARY-2 received a prescription for Vicodin from QUIROGA, it was for 60 tablets.  The next month it went up to 90 tablets. QUIROGA eventually moved BENEFICIARY-2 to 120 tablets of Vicodin per month.  BENEFICIARY-2 explained that when someone takes a Vicodin and Xanax together, they get "wasted."  BENEFICIARY-2 further explained that everyone knows this, but QUIROGA never had any discussions with BENEFICIARY-2 about this, or about any dangers associated with taking these medications together.

45. BENEFICIARY-2 described the medical care provided by QUIROGA at CAREFIRST as "shady" compared to the medical care s/he receives at the hospital, but stated it was just part of the game at CAREFIRST.  BENEFICIARY-2 explained that s/he, and other HIV infusion patients, were compensated for going to CAREFIRST with fast food during the infusions.  According to BENEFICIARY-2, it was common knowledge to everyone at CAREFIRST that the patients were being fed fast food.  Additionally, they were compensated with clothing as well as a pack of cigarettes during each ride home from CAREFIRST. Rides to and from CAREFIRST were provided free of charge from CAREFIRST drivers.  BENEFICIARY-2 stated that one time Emilitza Arias asked him/her

what s/he wanted for Christmas.  BENEFICIARY-2 received a DVD player as a
Christmas gift for going to CAREFIRST.

## PROBABLE CAUSE FOR FALSE STATEMENTS

46. On or about October 4, 2013, QUIROGA contacted the Detroit office of the DEA
    to report that someone had stolen his prescription pads.  Due to the theft,
    QUIROGA requested that he receive a new DEA controlled substance license
    number.  QUIROGA reported to the DEA that he had filed police reports,
    regarding the theft of his prescription pads, with the respective police departments
    in Southfield, Warren, and Grosse Pointe Park, Michigan.

47. Your affiant is aware that, at times, doctors engaged in drug diversion may report
    to the DEA that their DEA number has been compromised or stolen in an effort to
    build an excuse if ever questioned by law enforcement about their prescription
    writing practices.

48. An employee of the FBI accessed Oakland County's Courts and Law
    Enforcement Management Information System, commonly called CLEMIS to
    search for any such police reports filed by QUIROGA.  CLEMIS is an
    information technology system which promotes communication and sharing of
    criminal justice information among multiple agencies.  No such reports were
    found in CLEMIS.

49. Your affiant personally visited the respective police departments in Southfield,
    Warren, and Grosse Pointe Park, Michigan, and inquired with law enforcement
    personnel at each location regarding any such police reports that may have been
    filed by QUIROGA.  At each location your affiant was informed that no such
    police report had been filed within the respective department.

## CONCLUSION

50. Your affiant believes that probable cause exists that QUIROGA has provided false statements to the government, in violation of Title 18 United States Code Section 1001(a)(2), and has conspired to distribute, and distributed, controlled substances outside the course of legitimate medical necessity in violation of Title 21 United States Code Sections 841 and 846, and conspired to commit, and did commit, health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, and as such requests that a warrant be issued for the arrest of MARTIN FACUNDO QUIROGA-BAYAS.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

21

## REQUEST FOR SEALING

51. It is respectfully requested that this Court issue an order sealing all papers submitted in support of this application, including the application, affidavit, and arrest warrant until:  (a) the fact and particulars of the affidavit must be disclosed, pursuant to the government's legal obligations, to counsel for other individuals who may be arrested in the future; or (b) the government represents that the items covered by this motion can be made public without substantial risk to the safety of defendant or others.  I believe that sealing these documents in this fashion is necessary because the items and information to be seized are relevant to an ongoing investigation of a criminal conspiracy and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, e.g., by posting them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Peter A. Hayes
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on July 7, 2014:

Honorable R. Steven Whalen
United States Magistrate Judge

22